# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
July 8, 2010 Session

# TENNESSEE RAND, INC. v. AUTOMATION INDUSTRIAL GROUP, LLC,
### ET AL.

**Appeal from the Chancery Court for Hamilton County**
**No. 05-0203      W. Frank Brown, III, Chancellor**

---

**No. E2009-00116-COA-R3-CV - FILED SEPTEMBER 29, 2010**

---

In the apt words of the trial court, this case is a "complex business divorce case." The "divorced" and now adverse entities are Tennessee Rand, Inc. ("Rand"), and Automation Industrial Group, LLC ("Automation"), formerly Tennessee Rand Automation, LLC. Rand builds automated robotic equipment such as that used in the automobile industry. Automation was formed by the principals of Rand and some skilled collaborators for the purpose of doing the electrical and computer aspects of Rand's work. The entities fell out of favor with each other when the principals in Rand – Randy Nunley and Richard Roach – each a 50% shareholder in Rand, began to have conflicts. Nunley ended up as the sole owner of Rand and Roach acquired Nunley's interest in Automation. Rand initiated this litigation (1) to enjoin Automation from using the name, "Tennessee Rand Automation, LLC," (2) to recover the value of assets that Rand had transferred to Automation, and (3) to recover payments of rent and taxes that Rand had made on buildings occupied by Automation. Rand also named as defendants numerous principals and officers of Automation, including Roach. Automation filed a counterclaim seeking an award against Rand for some $6,000,000 in unpaid labor and expenses. In the bench trial that followed, the counterclaim accounted for 20-plus days of the 25-day trial. By the time the trial court announced its decision in a written memorandum opinion, the only parties remaining in the case were Rand and Automation, Roach having previously been dismissed by Rand with prejudice. The trial court found that the names of the entities were confusingly similar and ordered Automation to change its name. This was accomplished and is not an issue on this appeal. The trial court found that Automation was unjustly enriched by Rand's contribution of assets to Automation in the amount of $500,000. Also, the trial court found that Automation had been unjustly enriched in the amount of $162,818.80 by Rand's payment of rent and taxes on buildings used by Automation. Despite the prior dismissal of Roach as a defendant, the trial court held Roach liable to Rand for the rent and tax payments made out of Rand's account. On Automation's counterclaim, the trial court initially awarded it $2,270,759.22 plus prejudgment interest. Both parties filed a motion to alter or amend. The trial court

determined that Automation was guilty of fraud in the pursuit of its counterclaim and set aside that part of the judgment with the result that Automation recovered nothing on its counterclaim. Automation and Roach have appealed raising issues as to the counterclaim, the unjust enrichment award against Automation based upon the assets it received from Rand, and the unjust enrichment award against Automation and Roach based on the rent and tax payments. We affirm in part, reverse in part, and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part and Reversed in Part; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and D. MICHAEL SWINEY, J., joined.

Gary R. Patrick and R. Jonathan Guthrie, Chattanooga, Tennessee, for the appellants, Automation Industrial Group, LLC, and Richard Roach.

Richard W. Bethea and Tom Greenholtz, Chattanooga, Tennessee, for the appellee, Tennessee Rand, Inc.

**OPINION**

I.

Rand began as a machine shop in 1980. It was formed by Randy Nunley and Richard Roach. Each owned 50% of the stock in the corporation. Nunley, as president, was responsible for the day-to-day management of the company. Roach, as secretary, was seldom seen on site. He functioned from a remote office where his staff did the bookkeeping for numerous entities including Rand and Automation. Roach's staff typically input data into a computerized bookkeeping system, paid invoices after they were approved for payment and processed payroll. It was not unusual for Roach, from his office, to fund money needs of Rand and Automation by infusing money and signing promissory notes on behalf of the entities.

Nunley and Roach jointly owned numerous other business interests, including an airplane and a ranch. Their investments were lucrative enough that they were able to maintain the "Randy and Richard" bank account into which they deposited their profits and from which they funded their investments. It was routine for them to make transfers to and from the Richard and Randy account in amounts up to $500,000. Most of these transfers were made from Roach's office.

Over time, Rand grew and evolved into a designer and manufacturer of robotic tooling used in assembly lines. Applications to specific items that were discussed at trial include Harley Davidson motorcycle frames, lawnmower components manufactured by Electrolux, a Ford truck cross-member manufactured by Johnson Controls, and automobile seats manufactured by the Brown Corporation.

Rand's tooling work is naturally divided into mechanical and electrical. Mechanical includes the machine frame and moving parts. Electrical includes engineering design, wiring, and programming. Up until 1997, Rand outsourced the electrical, and concentrated on the mechanical aspect. One of the major vendors to Rand was Lawson Electric in Chattanooga. Rand became particular comfortable with the work of two of Lawson's employees, an electrical engineer named Jaroslav Tyman, Sr. ("Tyman Senior"), and a journeyman electrician named Greg Noll. Nunley approached Tyman Senior about joining forces. The two of them agreed in principle to form a company, to be owned equally by Nunley and Tyman Senior, which would do the electrical work that Rand had been outsourcing. The result of the agreement was Automation. The need for an electrician as well as an engineer led to the inclusion of Noll as a member of the new company. Nunley allocated half of his ownership to Roach. The resulting ownership percentages were as follows: Nunley 22.5%, Roach 22.5%, Tyman Senior 45%, Noll 10%. Tyman Senior was president and manager of Automation from the time of its formation until he was terminated by Roach in June 2006.[1]

The arrangement between Rand and Automation was mutually beneficial, and all went well for a period of time. Disagreements were few and resolved by discussion between Nunley and either Tyman Senior or Noll. Automation did what was necessary to cover the work generated by Rand's contracts; Automation billed Rand for its "time and materials" plus a mark-up. Typically, Automation's bills would be submitted to Nunley; Nunley would approve the invoices and forward them to Roach; and Roach would then pay Automation. They began using a billing arrangement similar to the one that Lawson had used in its dealings with Rand. It is undisputed that material was marked-up 21% and thus charged to

---

[1]Tyman Senior retained an interest in Automation but sold enough of his equity ownership to Roach to make Roach the majority owner. Tyman Senior also sold part of his ownership interest to his son, Tyman Junior, who was made the new president and manager.

Rand at 121% of Automation's cost.[2]  What happened with respect to labor depends upon whether Nunley is believed to the exclusion of Automation's numerous witnesses including Noll and Tyman Senior.  According to Nunley, beginning in 2002, labor was to be billed at three times the employee's wage.  He testified that the multiplier was never to be changed and Automation was not to bill extra for overtime.  By Nunley's account, the multiplier was full and total compensation, and travel time was to be at a lesser rate that Nunley could not recall.

According to Tyman Senior, Automation began its work for Rand charging $125 per hour for the engineering work performed by Tyman Senior and $65 per hour for the work performed by Noll and other journeyman electricians.[3]  Under this arrangement, Automation was permitted to bill Rand at 150% of the set rate for their overtime, or $184.50 for Tyman Senior and $97.50 for the others.  As Rand generated more work, Automation hired more production employees.  Some of the added employees were not as productive as Noll and Tyman Senior and were paid less per hour.  This factor, according to Noll and Tyman Senior, resulted in a modification of the labor billing whereby Automation would bill Rand at 400% of the rate paid to engineers and 340% of the rate paid to electricians.  In Automation's view, as expressed by numerous witnesses, this change benefitted Rand because the multiplication of lower wages resulted in a lower net charge.

At trial, Rand challenged billings by Automation in 2004 and 2005 for electricians at the rate of 375%.  Noll testified at trial that the 375% billing was a modification agreed to by Nunley as a blanket rate for electricians and engineers that ultimately saved Rand money.  Tyman Senior testified at trial that he recommended an increased rate for electricians to Nunley and that he, Nunley, did not object.  Tyman Senior testified that the drop to 375% for engineers was a clerical mistake.  Both Noll and Tyman Senior attributed the need to increase the multiplier for electricians to extensive overtime, including travel time, which more often than not happened at the end of long days or on weekends.

After Tyman Senior testified, the trial court, verbalizing two grounds for doing so, struck his testimony on two particular subjects.  The court granted Rand's motion to strike "with regard to the multiplier" and "with regard to his testimony on . . . trial exhibit 500."  Exhibit 500 was prepared by Rand to show Automation's inflation of invoices to Rand in

---

[2]There is a dispute as to whether Automation was allowed to mark up expenses such as travel and lodging expenses.  In the early days of Automation's existence, Rand would typically advance the expense. For example, Rand would purchase airline tickets and lodging for Automation's employees. Then, at Rand's insistence, Automation started paying its own expenses.  Automation added a 21% mark-up to the expenses. According to Nunley, the mark-up was not supposed to be applied to travel and other routine expenses.

[3]This approximates three times their hourly rate.

2004 and 2005. The court ruled that Tyman Senior lacked personal knowledge and that he violated the rule of sequestration by obtaining information on these subjects from his son Jaroslav Tyman, Jr. ("Tyman Junior") while the case was being tried.[4] Tyman Junior was Automation's first witness and was on notice that the rule of sequestration had been invoked.

As of December 1, 2003, Rand and Automation both believed that invoicing and payments were current between the two companies. In late 2003, maybe earlier by the account of Tyman Senior, Nunley announced that he was interested in selling Rand and wanted to make the company look good financially. It is undisputed that the sales price of Rand was to be a multiple of a standard business valuation tool, EBITDA, an acronym for "Earnings Before Interest, Taxes, Depreciation and Amortization." The financial figures used in the EBITDA calculations were to be confirmed by an audit. In December 2003, Nunley instructed Tyman Senior to hold invoices. The stated reason was to make Rand "look better." Tyman Senior, based on assurances that the invoices would be paid and out of his respect for the business acumen of Nunley, held approximately $1,000,000 in invoices that would otherwise have been billed in December 2003. Instead of sending the invoices, Tyman Senior held them at his desk. According to Tyman Senior, he continually pressed Nunley to allow him to send the invoices. Tyman Senior testified that Nunley always responded that the sale of Rand was about to be completed. Tyman Senior testified that at the time this was happening he had no doubt the invoices would be paid – it was just a matter of when. According to Tyman Senior, twice in 2004, Automation held invoices at the insistence of Nunley. One group of held invoices, for the January to April 2004 time frame, was approximately $551,000 in total. Rand allowed an amount to be billed at that time equal to the amount held. Another group represented approximately $1.3 million in invoices for the time period of April to October 2004. Tyman was later instructed to hide these charges by over billing other projects, but, on two separate attempts, Rand "vetoed" the inflated invoices because it was uncomfortable with the inflation of costs on the projects to which the charges were shifted. Eventually, Rand, according to Tyman Senior, instructed Automation to submit the $1.3 million bill and the $551,000 as special invoices for "engineering and consulting" so as not to skew the figures produced by Rand's audit conducted for the purpose of the pending sale.

Although the trial court found it unlikely that Automation held invoices in the amount of $1.3 million, Rand, significantly, produced in discovery a matching purchase order for "engineering and consulting services" in the amount of $1.3 million. Rand's purchase orders

---

[4]Tyman Senior carried personal notes to the witness stand which he used until counsel for Rand saw the notes and objected. Counsel for Rand was allowed to question Tyman Senior about the notes. Tyman Senior admitted that some of the information in his notes came from his son in response to questions Tyman Senior posed to him.

were the subject of numerous motions to compel by Automation. The first time, Rand produced a copy which redacted the information that linked the purchase order to the special invoice. Rand only produced the unredacted copy after being ordered to do so. Also, one copy of the invoice bears a signature approving the invoice. Nunley testified that he approved the invoice with plans to "fight it out" later. It is noteworthy that Nunley admitted that he did instruct Automation to hold one set of invoices in 2004 – a set that amounted to approximately $550,000. Nunley admitted that the reason behind holding the invoice was to raise the EBITDA factor. Nunley, however, testified that holding of the invoices was Roach's idea. Also, Nunley signed a bonus check to Noll and Tyman Senior at the end of 2004 in the approximate amount of what they would have received had the "held" invoices been billed. It is also undisputed that, in 2004, at Nunley's urging, Nunley's personal assistant had Automation's office manager alter information in Automation's job cost data base. Nunley admits that he rewarded the office manager by having his assistant procure and give the office manager a $500 gift certificate to a major department store. According to Nunley, he merely had the words "previous billing" deleted because, for the entries which he had altered, there was no "previous billing." Automation contends that the circumstances corroborate their contention that invoices were in fact held at Nunley's request and that he wanted the language "previous billing" deleted to keep potential buyers of Rand from asking questions.

In the process of trying to sell Rand, brokers engaged by Rand worked with two groups of investors. The first was T.A. Associates. The second was American Capital. Each group executed a letter of intent contemplating an acquisition of Rand. Both Roach and Nunley signed the first letter of intent with T.A. Roach did not sign the second letter with American Capital, dated January 19, 2005, because, according to his testimony at trial, he had then learned of the held invoices and had no confidence that the financial condition of Rand was as portrayed. The second letter of intent also conditioned the sale upon certain Automation employees, including Noll, moving to Rand. Noll refused to move. According to Nunley, the potential buyers remained interested, but he, Nunley, became disinterested for unspecified reasons.

On February 21, 2005, Rand locked Automation out of its facilities. This event has been referenced by the parties and the trial court as "the Split." We will continue with that terminology.

The Split was followed by a division between Nunley and Roach of all their assets and liabilities. As part of that division, Roach acquired Nunley's interest in Automation and Nunley acquired Roach's interest in Rand. Nunley is now the sole stockholder in Rand and Roach, after acquiring some of Tyman Senior's interest in Automation, owns the controlling interest in Automation. The only disputes that Nunley and Roach have been unable to

resolve are the monetary claims at issue in this case. The billing issues that we have outlined and will discuss in more detail below are the focal point. There are two other monetary claims that must be discussed.

One claim is that Rand paid rent and taxes on property that Automation occupied for which Rand is due reimbursement. There is no dispute that from November 2003 forward Automation occupied a building at 106 Spring Street in Chattanooga owned by Nunley and Roach. Previously, the building had been occupied by Rand, and Rand had paid Roach and Nunley $9,200 – $4,600 each – per month rent on the building. Rand also paid the property taxes on the property. After Rand left and Automation moved in, Rand continued to make the rent payments until the Split. The payments were made by checks signed by Roach. The payments during Automation's occupation total $147,200. The same scenario occurred with respect to the property taxes. Rand paid $15,618.80 in property taxes on 106 Spring Street between November 2003 and the Split, for which it seeks reimbursement from Automation.

Even though the amounts are not in dispute there is a dispute as to whether Automation is obligated to reimburse Rand. There is no proof of an express agreement on Automation's part to pay a monthly rent on the building equal to what Rand had paid. There is no written lease and certainly no assignment or sublease. There is evidence that Rand used the 106 Spring Street building for overflow projects even after Automation moved into the building.

The other monetary dispute concerns property that Rand shipped to Automation's plant after acquiring it from a Canadian manufacturing company named Dieco in May 2004. Both Rand and Dieco were working in 2003 on projects for Brown Corporation. Rand's contract with Brown required Rand to demonstrate that the robotic welding equipment it was installing for Brown would function. Dieco's work product – bent metal tubing – was necessary for Rand's demonstration that its welding equipment would work. Dieco was struggling financially so Rand loaned Dieco $500,000 and took a security interest in all of Dieco's assets. Dieco defaulted on the loan and Rand foreclosed. Rand shipped most of the assets to Automation's plant at 106 Spring Street. It is undisputed that some of Dieco's equipment was not shipped to Automation. Two cranes, for example, were left in Canada.

After discussions with Rand, Automation undertook to complete Dieco's contract. Noll testified that Rand, through Nunley, offered the Dieco assets to Automation as a gift if Automation would complete the Brown project. On cross-examination, Noll admitted that Nunley did not use the word "gift." Nunley admitted there were discussions but denied making a gift of the Dieco assets to Automation. Automation paid Dieco approximately $84,000 to help it close out its operation. Automation also paid approximately $42,000 in shipping costs. Rand was able to complete its contract and receive payment of approximately

$3 million from Brown. Automation claims, through its financial records, that it lost money on the Brown job, but Automation has been able to expand its business into tube bending with the Dieco assets. There is no document recording or memorializing a transfer from Rand to Automation of the collective assets. There is, however, one account receivable from Lear Corporation which was transferred by written assignment from Rand to Automation. The proof at trial was that the creditor would not pay without assurance that it was paying the right entity.

Only after the Split did Rand send an invoice to Automation, dated February 25, 2005, purporting to charge $500,000 for the Dieco assets. Later, Rand claimed that the assets were worth $1.3 million and during trial amended the claim to assert that the assets were worth $1.9 million.

By letter dated February 24, 2005, one day before the Dieco invoice, Rand confirmed that it was terminating Automation and cancelling all outstanding work orders. The letter specifically addressed outstanding invoices as follows:

> The summary billing information previously furnished on [Automation]'s invoices does not provide us with enough detail to properly review the charges incurred. In order that [Rand] may process payments to [Automation] as quickly as possible, we are requesting that [Automation] supply to us detailed job-to-date supporting documentation (from the job's inception through February 20, 2005) for each . . . Rand project for which any [Automation] invoice was submitted to us with a date of August 1, 2004 or later. This supporting documentation for each such project should include the following:
>
> Detail of Labor Charges – Date and hours charged for each day by [Automation] employee and their respective hourly billing rate (this detail should total to the total job-to-date labor billed).
>
> Detail of Material Charges – Detailed bill of materials (including descriptions, quantity, supplier name, unit and extended costs that total to the job-to -date material billed) and a copy of related supporting vendor invoices. Also indicate the physical delivery date of the material to . . . Rand's facility or to the . . . Rand customer's facility if drop shipped.

> Itemized listing of all invoices rendered to . . . Rand related to this project including [Rand] job #, [Rand] invoice #, invoice date, invoice amount, . . . Rand purchase order # and . . . Rand job # (including a job-to-date total billed), including any previously unsubmitted invoices for all work through February 20, 2005.

(Underling in original). Nunley testified that he signed the termination letter without reading it and did not even know what it said.

At trial, Automation took the position that it was not relying upon its invoices to prove its counterclaim. Automation argued Rand's demand that Automation hold invoices in 2003 and 2004 created so much confusion that the invoices were not the best evidence of the amount owed. Instead, Automation commissioned Tyman Junior, who designed and implemented Automation's job cost database, to comply with Rand's demand in its termination letter and reconstruct the amount owed Automation using the "job-to-date" database.

However, considerable trial testimony focused on criticizing or explaining eight "sets" of invoices generated by Automation and received by Rand after November 2004. The invoices, by "set" number, date generated, and amount, are as follows:

| Set | | |
|---|---|---|
| 1 | Nov. And Dec. '04 | $2,323,225.39 |
| 2 | Nov. And Dec. '04 | $2,846,819.12 |
| 3 | Nov. And Dec. '04 | $1,419,238.32 |
| 4 | April and May '04 | $ 551,803.54 |
| 5 | Nov. 04 | $1,319,200.54 |
| 6 | Feb. 2005 | $1,789,555.54 |
| 7 | April 12, 2005 | $3,704,904.48 |
| 8 | May 4, 2005 | $ 2,286.34 |

The testimony and even the "facts" in the briefs concerning the listed invoices are confusing at best. We are presented with Rand's position that the invoices mean nothing and must all be fraudulent contrivances, and the contrasting position of Automation as exemplified by Tyman Junior's explanation of invoices, many of which he did not prepare and would not have been responsible for either holding or sending. Interspersed is testimony of Tyman Senior and Noll, both of which relied, to some extent, on sources other than their personal knowledge to supplement or "refresh" their memory. Nevertheless, there is some common ground as to the invoices from which some useful information can be gleaned. The first and

second sets of invoices are not real figures but inflated by some amount of held invoices that, according to Automation, the parties were trying to work into the mix. Only the third through the sixth sets represent nonduplicative invoices, the sum of which is approximately $5.0 million.[5] If the seventh set, sent to Rand shortly after the split, is read in the context of Rand's previous request for an understanding of the total amount owed (with credit for payments made implied), the seventh set roughly approximates the non-duplicative billing in 2004-2005 ($5.0 million) minus payments of approximately $1.3 million ($500,000 and $800,000). Tyman Junior testified that Automation had received no payments from Rand since the termination letter. Shortly before the termination letter, in early 2005, Automation received one payment of $833,507.66. Automation also concedes in its brief that in April and May of 2004 it received payments from Rand of approximately $550,000. This payment corresponds to the invoices billed in early 2004 that matched another $550,000 that were held.

Tyman Junior stated that the termination letter asked for a level of detail more than had ever been demanded between the related companies. Noll testified that, before the Split, the dealings between the two companies were informal with Nunley calling the shots on a day-to-day basis. Nunley admitted that at no time before the termination letter did he send written notification to Automation complaining of their billing practices. Nunley testified at trial that he had orally complained to Automation of overbilling, but was impeached with his deposition testimony to the contrary.

Tyman Junior has had some experience with Automation dating back to part time work while he was a student. Tyman Junior designed and implemented the job cost system presently in use by updating a system his father had previously used. Tyman Junior testified that using the material in the job costing database, he first calculated the amount due from Rand as $5,995,000 and provided his findings to Rand. As the terminology implies, the job cost database is the system that Automation employs to track its cost on a given job and from which it generates its invoices to customers, including Rand. The data in the job cost database that is pertinent to this case is labor, material cost and expenses. Engineers enter their time directly into the job cost database. Other employees record their time on a time sheet and office personnel then enter the time into the system. Either way, time is recorded by project number, amount of time, and description. Labor entries are consecutively numbered to prevent random insertion of false time entries.

Material costs are largely of two types – direct purchases and stock materials. Direct purchases, as the description suggests, consist of materials that are purchased by Automation for use on a particular job. These materials are matched to a Rand project by project number.

---

[5]According to Rand, even the third set duplicates part of the $550,000 in held invoices.

Data entry includes date of invoice, amount, Rand project number and purchase order number. Stock materials are materials Automation keeps on hand, in stock, for use as needed on any given job. This material is allocated to a particular job when the employee that is going to use the material records it in the "stock charge out book."

Expenses are simply those incidental charges, typified by travel and lodging, incurred by workers on a given project. Some are credit card charges. Some of these are on a company credit card and some are not. Sometimes an employee will borrow a card, often a company card, from another employee who is not working on the same project. This is the explanation given by Automation to charges reflected under the name of an employee who had no time on projects to which expenses were charged. Occasionally, a credit receipt will be lost and will be manually recreated and entered into the system.

Tyman Junior and numerous Automation employees described the process by which the labor, materials and expenses are recorded and entered into the system. Automation's office manager, Misty Frizzell, testified that she always tries to be careful to assure that only accurate information is honestly recorded. Misty was not asked a single cross-examination question by Rand.

Tyman Junior assembled into project folders the job cost for each job Automation had worked on in the 2004-2005 time frame. Each project folder purported to reflect the total cost incurred, utilizing the labor multiplier and material and expense mark up of 21%.

In late 2004 or early 2005, Rand hired a CPA named Ken Baker to assist in gathering information to accomplish the sale of the company. It was Baker who received and responded to Tyman Jr's presentation of $5,995,000 as the amount due Automation. Baker analyzed in detail Automation's claim as constructed by Tyman Junior and found numerous problems. We will give the highlights. Baker found that Automation employees had improperly recorded time for cleaning their work areas and for performing routine maintenance around the building and grounds. Baker also found that Automation employees charged time to Rand projects for ordering materials and for handling materials once delivered. Baker criticized some time descriptions, such as "tooling" and "sleeving" and "wiring." Also Baker found that the multiplier had been improperly increased above 3.0 to 3.75 for some employees. Baker found that more materials were charged to some projects than there were component parts in the project. By far, the largest single entry challenged by Baker was an invoice for Greg Noll's time in the amount of $400,000.

According to Tyman Junior, he worked through all of Baker's objections and removed any questionable charges. Notably, the invoice for Greg Noll's time was removed as a basis for the claim before the case went to trial. Nevertheless, Noll was questioned concerning the

charge. Noll testified that as a supervisor, he usually did not bill for his time. However, Noll testified that he billed for his work approximately 10% of the time, especially if he was acting in more of a production role than a supervisor. Noll explained that when Automation was created, Nunley received nearly one half the ownership interest in the company in exchange for his commitment that Rand would use Automation for all its electrical and computer programming work. Noll felt that Rand's sudden severing of all ties with Automation altered the equation and justified Noll in billing Rand for his time. Noll further felt justified in charging Rand for his time because, in the months leading up to the termination, he worked almost exclusively at Rand's site on Rand's projects, often with his tools beside the production workers, with the result that Rand made a considerable profit. Nevertheless, Noll testified that when Rand questioned the charge, it was removed because Automation preferred to remove anything questionable rather than force the issue. At one point during the re-direct examination of Noll, the court sustained an objection to Noll talking about the invoice as irrelevant:

> The Court: Let me ask you a question. He said 17 times he's kicked the $400,000 out. What relevance does it have to my ultimate decision?
>
> Mr. Patrick [Counsel for Automation]: I don't think it has any.
>
> The Court: Sustained.

As to the other charges, Tyman Junior testified that few of the criticisms were justified. Tyman did, however remove any labor charges that did not contain a description of the service performed, and he removed any direct material charge which he could not substantiate with an invoice. Automation produced in discovery copies of all invoices for each job folder as well as employee time sheets. The weight of the testimony at trial was to the effect that CPA Baker was inexperienced in this particular manufacturing environment and that he therefore did not understand that descriptions such as "tooling", "sleeving cable" and "wiring" were routine tasks that were well understood. Also, Baker's criticism of too many parts on one project was wrong because, for example, instead of one robotic arm which might have required 10 sensors, there were four robotic arms which would have required 40 sensors. Further, there was persuasive testimony to the effect that building and implementing a component of robotic tooling is as much an art as a science and that the initial plans and bill of materials will usually change as a given machine evolves from drawings and raw materials to become part of a working assembly line. Numerous Automation witnesses testified that they charged for cleaning because Nunley insisted that the plant be kept clean, especially when visits from Rand customers were scheduled.

-12-

Tyman Junior also testified that when he went to the job cost system to extract the information demanded by Rand, he found that Automation had not charged Rand for some of the work that it had done in 2002 and 2003 for work that was uncompleted as of January 2004. Tyman testified that this added $665,000 to Automation's claim.

In the course of discovery, Automation produced its job cost system in digital form. Automation sought from Rand its, Rand's, job cost system under the theory that the data in Rand's system would demonstrate that Automation's charges were "in line" with Rand's expectations. Primarily, Automation contended that its billing was in line with charges to Rand from other vendors and to the ultimate customer from Rand. Rand resisted the discovery and the trial court denied Automation's motion to compel Rand to produce its job cost system. Automation points out that it had a similar problem acquiring Rand's purchase orders, and that when it did secure unredacted copies of the purchase orders on the eve of trial through an order compelling production, it was able to match *exactly* a purchase order to the aforementioned $1.3 million consulting and engineering invoice.

On the morning of trial, Automation moved to exclude voluminous exhibits that Rand produced just seven days before trial ("the 7 day documents"). Rand resisted the motion, arguing that the exhibits contained no new documents – they were simply the analysis of information previously supplied. The court denied the motion to exclude but gave Automation the option of a continuance or additional discovery during breaks in the trial.

The trial court took the case under advisement and later entered a fairly detailed memorandum opinion and order approximately 90 days after the trial ended. It found that the question was not whether Rand owed Automation for work done on Rand projects, but, rather, how much Rand owed Automation.

The first aspect of Automation's claim that the court addressed was the claim that $33,867.76 of material in Automation's stockroom should be Rand's responsibility because it was specifically acquired for Rand's jobs and was otherwise worthless to Automation. The court denied this aspect of the claim for three reasons. First, the court believed Automation had been invited to make such a claim in direct response to Rand's termination letter but did not. Second, the court believed that the materials were such that they remained useful for other projects. Third, the court held that in making the claim, Automation bore the burden of showing that the material could not be returned for credit, which burden Automation did not bear.

The second aspect was Automation's claim that Rand owed $6,075,208 for labor, material and expenses Automation incurred directly on Rand contracts. The court noted Rand's defense that Automation was "guilty of fraud in presenting its claim," but the trial

-13-

court did not make a specific finding of fraud. The court specifically rejected Rand's contention that Automation could not increase its labor charge or multiplier.

The court ultimately found that Rand was responsible for unpaid charges in the amount of $2,270,759.22, largely based on information other than the Automation invoices or Tyman Junior's reconstruction of job cost. The trial court took particular note that Automation had issued credit memos in April 2005 in the amount of $1,530,103.75. According to its internal financial reports, Automation's total receivables at the end of 2004 was $4,333,433.00. Accounts receivable aging reports showed Rand owing $2,846,819.12 as of December 31, 2004 and $3,800,866.97 as of February 21, 2005, or the time of the Split. The court noted that this amount matched Automation's customer ledger for Rand. "The court believes the calculation set forth above [giving $1,530,103.75 credit issued April 2005 against $3,800,866.97 owed as of February 21, 2005], according to [Automation's] financial records, is correct." The court explained its method as follows:

> The court has used [Automation]'s Financial Statement, customer ledger, and accounts receivable aging report detail to limit [Automation]'s Claim against [Rand]. It is only fair and natural to limit [Automation] to the account receivable listed in its tax returns, accounts receivable aging detail report, and customer ledger. These documents list the balance due, after crediting [Rand] with payments of $835,507.68 to [Automation]. These payments were recorded between January 4-21, 2005. However, the [Automation] documents do not show the April credits from [Automation].

> There was one troubling aspect of the customer ledger. The court saw no payments close to totaling over $550,000.00 like Trial Exhibit 606 for April or May of 2004. This raises a question as to whether [Rand] has been given credit for all of its payments to [Automation].

The court also listed five credibility concerns that caused it to favor Rand in its evaluation of the amount due. First, trial exhibit 500 was more a "hodgepodge" than a systematic billing. Second, the court found Automation's invoice for Noll's work in the amount of $400,000 was unbelievable. Third, the court saw Noll's invoice as an indication that other inflated invoices existed. Fourth, the trial court expressed puzzlement as to why the job cost system would not match invoicing. And fifth, the fact that Automation issued credits yet the claim always hovered around $6,000,000 caused some concern. Without specifically finding that any of Automation's witnesses were not credible, the court expressed

general concerns with both Noll and Tyman Junior. The court did not believe that Automation held invoices of $1.3 million, partly because Roach had admittedly become upset when he learned about the $550,000 in held invoices without any such demonstration regarding the $1.3 million in held invoices. Finally, the court viewed Roach's personal attacks against Nunley and Roach's admission from the stand that he had no personal knowledge upon which to base the attacks, as having some link to inflated billings, apparently done to fund Automation with a view to the oncoming Split.

The court held that Rand did not give the Dieco assets to Automation. The court found that the elements of unjust enrichment were present under ***Freeman Industries v. Eastman Chemical Co.***, 172 S.W.3d 512, 525 (Tenn. 2005), the essence of that case being that a party receives a benefit under circumstances that would make it unequitable to retain the benefit without payment. One factor that swayed the court considerably was Tyman Senior's admission that Automation had billed over $5 million for tube bending after acquisition of the Dieco assets. However, the court did not accept Rand's contention that the assets were worth $1.9 million. The court looked to numerous factors, including the amount of the initial loan of $500,000 to Dieco from Rand and the amount of Rand's first invoice of $500,000 to Automation, and set the award at $500,000.

As to Rand's claim for reimbursement of rent and taxes, the trial court held Automation liable for the full amount claimed of $162,818.80. The court rejected Automation's argument that it could not be held liable because it had not agreed to the amount being paid by Rand. The court reasoned that an express agreement is not necessary for a recovery based on quantum meruit. The court also rejected Automation's argument that the payment by Rand to the property owners did not necessarily reflect fair rental value. The court stated that the amount paid most likely reflected a fair value and that if Automation had not been satisfied with the amount, it should have tried to negotiate an amount it thought reasonable. The court held that, of all the claims made in the case, this one was the most certain.

Even though Rand had dismissed its claims of slander, breach of fiduciary duty and interference with business relations against Roach with prejudice, the trial court nevertheless entered judgment against Roach and in favor of Rand on the rent and taxes reimbursement claim. The sum total of the court's rationale is as follows:

> [O]n the basis of an issue tried by consent or implication, [Rand] may also be due a judgment for $162,818.80 against Richard Roach for conversion, negligence or mistake as Mr. Roach was in control of the payment of bills. Mr. Roach, whether he used [Rand's] funds on purpose, by negligence or by mistake, should

-15-

have to reimburse [Rand] for its lost monies if [Rand] does not recover from [Automation]. The court will make this finding an alternate judgment if [Automation] is found not to be liable to [Rand] for $162,818.80 or any part of said sum.

The court awarded prejudgment interest on all the monetary awards. On Automation's award, the court allowed 5% interest from April 25, 2005, on approximately $550,000 and 1.25% on approximately $1.7 million for a total of $256,705.19. The court awarded 4% on the Dieco assets from May 30, 2006, for a total of $45,000. On the rent and taxes claim, the court awarded 6% from May 30, 2006, for a total of $21,899.53.

As we have previously stated, both Rand and Automation, joined by Roach, filed a motion to alter or amend. In granting Rand's motion to alter or amend, the trial court transformed its non-specific "credibility" concerns into a finding of fraud. The court analyzed the motion as follows:

> The questions . . . presented in this part of the case . . . are two. One, did [Automation] submit fraudulent documents in an effort to collect money from [Rand]. Two, if so, what is the legal consequence of such fraud.
>
> The court has reviewed the Memorandum Opinion filed herein on August 29, 2008. [Automation]'s account receivable claim was discussed from page 33 to page 44. Some conclusions from the opinion are as follows:
>
> (1) [Automation] prepared false invoices for collection of its claim(s) against [Rand]. The amounts shown on the invoices vary considerably. A summary of the invoices [Automation] prepared for [Rand] is set forth on page 36 of the Memorandum Opinion filed on August 29, 2008.
>
> (2) [Automation] issued to [Rand] certain credit memos for specific entries or charges set forth in the invoices. These credit memos were based upon [Rand]'s specific complaints about certain charges. [Automation] admitted to some errors in its billing. For example, one invoice to [Rand] was for $400,000 for Greg Noll's supervision of work at [Rand]'s facilities.

-16-

(3) [Automation]'s customer ledger does not show payments of, or close to, the $552,853.70 paid to [Automation] by [Rand] based upon a list of outstanding billings to [Rand] submitted on April 24, 2004. The payment of $552,853.70 was approximately one-half (½) of [Automation]'s new or previously unbilled amounts to [Rand]. This raises a question of whether [Automation] gave [Rand] credit for such payment, which was one-half (½) of the unbilled amounts submitted to [Rand] by [Automation]. The other part of the billing was not initially paid but "held." . . .

(4) The court discussed on page 42 of the Opinion filed on August 29, 2008 five reasons why the court could not believe all of the financial documents submitted by [Automation]. The court's opinion on these issues has not changed.

(5) Certain actions at or during trial by [Automation] officers, or failure to act previously, generated concern about [Automation]'s position. Some of these factors were mentioned under the credibility issue discussed on pages 42, 43 and 44 of the Memorandum Opinion . . . . The court's opinion on these issues has not changed.

(6) The court based its decision on the account receivable amount shown due from [Rand] in [Automation]'s financial documents because the amounts claimed would be factored into the income tax return of [Automation]. Yet, in its post-trial position, [Automation] claims that it was owed more than [Automation] listed as the account receivable amount in its financial records. The reason stated for not declaring or listing all receivable amounts was that [Automation] had to pay tax on the amount of receivables listed. Because of cash flow issues, [Automation] failed to list the total of all of the account receivables claimed from [Rand] because [Automation] could not afford to pay taxes on such a large amount. Such action amounts to fraud on the United States. These acts constitute "unclean hands."

(7) The "facts" smell bad. [Rand] made efforts in August and October of 2004 for [Automation] to submit all of its billings to

[Rand]. Indeed, [Automation]'s customer ledger [showed a] zero balance due from [Rand] as of November 3, 2004. . . . There remained a zero balance until December 28, 2004, when [Automation] added invoice amounts due from [Rand]. These invoices, 45 dated December 28, 2004 and two dated December 29, 2004, totaled $2,846,819.12 . . . . According to Trial Exhibit 500, the $2,846,819.12 in invoices are set forth in the Second Set of Invoices received by [Rand] on or around December 28, 2004. [Automation]'s third set of invoices was received [by Rand] on or about December 29, 2004, and these invoices, for the same period of time, totaled $1,419,238.52. Later, on January 17, 2005, Mr. Noll told [Rand] that there was nothing big in the pipeline due [Automation], mostly repair and service work. Yet, [Automation] sent [Rand] large invoices in February and April of 2005. . . . [Rand] paid [Automation] $835,507.68 between January 4-21, 2005.

Based upon the ***Nashville Ford Tractor*** decision, this court must deny [Automation] any recovery of its account receivable claim against [Rand]. Nashville Ford Tractor [,the dealer,] was admittedly due some unpaid rents. Yet its falsely adding a location of the equipment used to place all equipment under one payment bond and other documentation to support that claim resulted in the lessor's loss of <u>all</u> monies due it. [Automation] must bear the same consequence.

(Underlining in original, some record citations and headings omitted). Otherwise the court left its original judgment undisturbed.

II.

Automation[6] raises the following issues on appeal which we have restated and consolidated to eliminate duplication:

Whether the trial court erred in nullifying Automation's claim in its entirety for fraud based on ***Nashville Ford Tractor, Inc.***

---

[6]Rand makes the request in the "conclusion" of its brief that we remand the case to the trial court to consider an award of attorney's fees as a sanction. This matter is not mentioned in Rand's "Statement of Issues Presented" and there is no supporting authority cited. We decline Rand's request.

***v. Great American Insurance Company***, 194 S.W.3d 415 (Tenn. Ct. App. 2005).

Whether the trial court erred in reversing its award to Automation on Rand's motion to alter or amend, in the absence of newly presented evidence or legal authorities.

Whether the trial court erred in refusing to grant Automation's motion to alter or amend the amount of its monetary award against Rand to the full amount claimed by Automation.

Whether the trial court erred by not allowing Automation discovery of Rand documents that would have allegedly substantiated Automation's invoices.

Whether the trial court erred in not excluding documents introduced by Rand on the issue of Automation's invoice claim that were not produced in discovery.

Whether the trial court erred in entering a judgment against Richard Roach after he had been dismissed from the case with prejudice.

Whether the trial court erred in striking portions of the testimony of Tyman Senior.

Whether the trial court erred in its credibility determinations.

Whether the trial court erred in finding that Automation was unjustly enriched by Rand's contribution of assets and that they were not a gift from Rand.

Whether the trial court erred in finding that Automation was unjustly enriched by Rand's payment of taxes and rent on buildings occupied by Automation.

Whether the trial court erred in its award of discretionary costs to Rand by including costs that are not allowable under Tenn. R. Civ. P. 54.04(2).

III.

The trial court's factual findings are reviewed *de novo*, but are accorded a presumption of correctness unless the evidence preponderates against those factual findings. Tenn. R. App. P. 13(d); ***Money & Tax Help, Inc. v. Moody***, 180 S.W.3d 561, 565 (Tenn. Ct. App. 2005). A trial court's findings which hinge on credibility will not be overturned absent "clear, concrete and convincing evidence" to the contrary. ***Tennessee Valley Koalin Corp. v. Perry***, 526 S.W.2d 488, 490 (Tenn. Ct. App. 1974); *see* ***Wells v. Tennessee Bd. of Regents***, 9 S.W.3d 779, 783 (Tenn. 1999). If the trial court makes no factual findings, we simply review the judgment *de novo* for the preponderance of the evidence, without a presumption of correctness. ***Kesterson v. Varner***, 172 S.W.3d 556, 566 (Tenn. Ct. App. 2005). A trial court's conclusions of law are reviewed *de novo* with no presumption of correctness*. **Vantage Technology, LLC v. Cross***, 17 S.W.3d 637, 644 (Tenn. Ct. App. 1999). We review evidentiary rulings of the trial court for abuse of discretion. ***White v. Vanderbilt Univ.***, 21 S.W.3d 215, 222 (Tenn. Ct. App. 1999). Failure to follow the controlling legal standards to the prejudice of one of the parties constitutes an abuse of discretion*. See **Overstreet v. Shoney's, Inc.***, 4 S.W.3d 694, 709 (Tenn. Ct. App. 1999). A trial court's decision on a motion to alter or amend a judgment is also reviewed for abuse of discretion. ***Chambliss v. Stohler***, 124 S.W.3d 116, 120 (Tenn. Ct. App. 2003). Although it is not the function of a motion to alter or amend to relitigate a matter that has been fully adjudicated, it is permissible under a Tenn. R. Civ. P. 59 motion for a "trial court to revisit and rectify errors that were made when the court overlooked or failed to consider certain matters." ***Morrison v. Morrison***, No. W2001-02653-COA-R3-CV, 2002 WL 31423848 at * 2 (Tenn. Ct. App. W.S., filed Oct. 29, 2002). Finally, a trial court's decision on discovery motions whether to limit or permit discovery is reviewed for abuse of discretion. *E.g.*, ***Frye v. St. Thomas Health Servs.***, 227 S.W.3d 595, 600 (Tenn. Ct. App. 2007).

IV.

A.

We begin by commending the trial court for its attempt to make sense of the mass of information presented in this case. The testimony on the counterclaim alone consumes some 5000 pages of transcript, with approximately 150 accompanying exhibits, many of which are voluminous. The transcript is especially hard to decipher because the testimony is interspersed with argument and what borders on testimony by the lawyers. The pattern established in the trial court is continued in the voluminous briefs. Even when the parties agree about a fact or point of law, which is seldom, they disagree about its impact. Now it is our turn to try to condense this massive project into a manageable discussion of the issues.

## B.

We begin with the issue of whether the trial court abused its discretion in granting Rand's motion to alter or amend on the basis of *Nashville Ford Tractor*. The answer to this question boils down to whether the trial court was correct in finding fraud of the nature presented in that case. Before we can complete our mission, we must determine whether the fraud such as alleged here may be proven by a preponderance of the evidence or whether it must be shown by clear and convincing evidence. *See Estate of Acuff v. O'Linger*, 56 S.W.3d 527, 529 (Tenn. Ct. App. 2001). According to *Acuff*, there are two lines of cases and the level of proof depends upon which side of the line a particular case falls. *Id*. The line of demarcation is not altogether clear. *Id.* In general, tort cases based on misrepresentation can be won based on a preponderance of the evidence, but for a party to successfully defend against enforcement of a contract on the basis of fraud, the party must show the predicate facts by clear and convincing evidence. *Id.* at 531. This present case, we believe and so hold, falls closer to the latter than the former. We must, therefore review the proof to determine whether it is such as to establish in the trier of fact an abiding conviction that it is highly probable Automation was guilty of fraud. *Id.* at 535-36.

## C.

Before focusing on the central issue, we will briefly address one of the arguments that seems to swirl around the vortex. Automation, apparently nervous over the content of some of the invoices, argues that it did not rely on the "invoices" to prove its case. Rather, Automation says it relied on a spreadsheet of numbers produced from its job cost database. On this point, we agree with Rand that if Automation submitted fraudulent invoices as the basis for its claim, then it should not be allowed, after it is caught, to simply turn away from the invoices and chart another course toward the same goal.

## D.

With this understanding, we proceed directly to the trial courts' seven numbered findings upon which it based its reversal of the original judgment. The first finding was that Automation prepared false invoices as reflected in the eight sets we have set forth above, which were sent to Rand after November 2004. The trial court specifically mentioned the variation in amounts as a basis for its finding. We agree with the thrust of Automation's position that confusion and variation in the eight sets of invoices is largely the result of Rand's admitted attempt to defer at least some expenses to make it "look better" to potential buyers and drive up the sales price under the EBITDA factor. Even though Rand admitted directing Automation to hold the $550,000 group of invoices, it denied directing Automation

-21-

to hold the $1.3 million group of invoices and convinced the trial court of its position.

Normally, we would defer to the trial courts "credibility" finding, but in this case there is direct "concrete" documentary evidence that contradicts the trial court's finding. *See Perry*, 526 S.W.2d at 490. That evidence is the purchase order issued by Rand for $1.3 million in consulting and engineering – a document that Rand attempted mightily to hide from discovery. Also, one copy of the invoice was admittedly approved by Rand. The evidence more than preponderates in favor of finding that the invoices then sent by Automation contained a mixture of current billing and previously held billing. Moreover, Rand's complicity in the variation and confusion in the invoices is corroborated by the fact that Rand paid, by way of a hidden bonus, an Automation employee to enter Automation's database and alter invoices. Further, Nunley paid Noll and Tyman Senior a bonus as if the $550,000 and $1.3 million amounts had been billed. We believe, and so hold, that there is clear and convincing evidence of fraud on the part of *Rand*, not Automation, that generated the majority of the confusion as to Automation's billings to Rand.

The second finding that the trial court cited as evidence of fraud was Automation's admission of erroneous billing. The only erroneous invoice that the trial court referenced directly was the $400,000 invoice for Mr. Noll's time. Rand describes Noll's invoice as "[o]ne of the most egregious examples of outright fraud" in the record. While we believe it is the most egregious example of an invoice created with the idea of padding the claim, we think that even it does not rise to the level of fraud that will preclude a claim as discussed in *Nashville Ford Tractor*. Before we discuss distinctions, we will provide a snapshot of the *Nashville Ford Tractor* case. Equipment dealer Nashville Ford Tractor, Inc. leased two excavating machines and one wheel loader to Murrell. Murrell contracted with Webster, the prime contractor, to perform work on at least two projects, the Lock Four Road project and the Gallatin Industrial Center project. Murrell abandoned the work and left it for Webster to finish. Murrell did not pay the dealer for the use of the equipment. The dealer made a claim against the prime contractor's performance bond on the Lock Four Road project. Knowing full well that at least two pieces of the equipment were used on other jobs, the dealer not only falsely represented that all three pieces were used exclusively on the Lock Four Road project, but went so far as to alter the lease documents to reflect that the equipment was leased for that particular project. Unfortunately for the dealership, there were other copies of lease documents around that demonstrated the alteration. On appeal, we held that the fraud on the dealership's part precluded it from recovering any part of its claim against the bond. *Id.* at 428.

We see two significant differences between this present case and *Nashville Ford Tractor*. First, even after the alteration was called to the dealership's attention it continued to rely, even on appeal, "to this day, . . . on the altered lease agreements rather than

attempting to provide the unaltered versions to the court and the other parties." *Id.* at 427. Automation witnesses, including Noll, testified that when CPA Baker raised concerns about Automation's billing, it examined specific concerns and attempted to remove all questionable charges. Noll's invoice was specifically removed from the claim over a year before the case came to trial. The trial court must have believed that Automation and Noll attempted to do the right thing as to this particular charge because, as we noted in our recitation of facts, when Automation attempted on redirect to have Noll explain the invoice at length, the trial court cut him off. The court reasoned that the removal of the invoice from the claim was all that mattered.

The second distinction is that Noll had a colorable innocent explanation for the invoice, even though he agreed to its removal as questionable. It was not unknown for Noll to charge for his time, especially when his work was more production than administrative. For this work, he was primarily at Rand's facility working with his tools beside production workers. And, while he might not normally have thought about charging for all his time, he thought in this instance that Nunley had wronged Automation by depriving it of the very thing that Nunley had promised in exchange for an ownership interest. As we have noted, Noll might have had even more to say on the issue had opposing counsel and the court not cut him off.

The third subject that the trial court offered was more a question than a finding. The court had some concern that Automation had not recorded a credit for payment on the group of billed invoices that corresponded to the $550,000 in held invoices. Automation contends in its brief that it did give Rand credit for the payment and offers citation to exhibits that confirm its position. Under the circumstances, knowing that Automation was holding some invoices as virtually non-existent at Rand's request, we will not fault Automation to the point of ignoring its claim even if it did fail to record all payments until it could see how the "held" invoices were going to be handled by Rand.

The fourth subject that the trial court raised was its "reasons why the court could not believe all of the financial documents submitted by [Automation]." Our previous discussion has made clear that we disagree strongly with the trial court about the driving force behind the confusion in Automation's invoices. We will not break that discussion down by number here, partly because most of the other reasons are discussed in part or in whole elsewhere. Moreover, since Automation's fraud must be proven by clear and convincing evidence, it is not enough that we reject some of Automation's invoices as unproven or some of its proof as unbelievable.

The fifth subject listed by the trial court was "[c]ertain acts at or during trial by [Automation] officers." In the absence of specific findings we can only discern three matters

-23-

to which the trial court might have been referring. The first is Mr. Noll's demeanor in being unusually slow to answer questions and his creation during trial of a list of Dieco assets delivered to Automation. As we have indicated, fraud is not proven by the fact that one of a party's witnesses is unbelievable on a specific point. Juries are routinely instructed that they can believe a witness on one point and disbelieve him or her on another. 8 Tennessee Practice, Tennessee Pattern Instructions, Civil § 2.22 (2009). A second matter was Tyman Junior's role in preparing his father to testify despite the rule of sequestration, and his being impeached about which Dieco assets were directly assigned to Automation. In addition to reiterating the distinction between credibility and outright fraud, we note that the Dieco assets had little to do with the counterclaim, and that the trial court refused to strike Tyman Junior's testimony as a sanction. The third matter that the trial court alluded to was Roach's perceived failure to object to Rand's request to hold the $1.3 million of invoices, despite his protest of the $550,000 in held invoices. As we have discussed, this silence by Roach was taken by the trial court to negate the suggestion by Automation that $1.3 million in invoices were held at the request of Rand, but the documents prove to this Court that invoices approximating that amount were, in fact, held. In short, we do not believe the fifth finding weighs heavily against Automation.

The sixth matter that the trial court weighted against Automation was the fact that it claimed over $6 million was owed but reported only $4.3 million in total accounts receivable on its income tax return. The only justification offered by Automation, according to the trial court, was that it could not afford to pay taxes on the full amount. On appeal, Automation elaborates on its position. Automation points out that normally Rand will approve invoices before they are booked. It was the "approved' invoices that were therefore reported as receivables with the others being, at least impliedly, in dispute. Automation's explanation makes abundant sense to this Court, especially in light of the outcome. To uphold the trial court we would need to hold that even though Rand only really owed Automation approximately $2.2 million, it was required to report on its tax return that Rand owed it $6 million. We realize that tax returns could later be amended to show that what was thought to be $6 million was actually $2.2 million, but, by the same token, they could be amended to show that what was thought to be $4.3 million in receivables turned out to be $6 million. We are especially uncomfortable in denying Automation recovery on the basis of one entry in a tax return.

The final matter mentioned by the trial court as the basis for fraud is that the facts "smell bad." We do not disagree with that conclusion, but we find and hold that most of the bad smell must have been coming from Rand's side of the courtroom. The "smell" finding was made in the context of Rand's alleged insistence that Automation bring its invoicing current. Automation witnesses explained, however, that Rand's left hand, that was asking for invoices, did not know what Rand's right hand, *i.e.*, Nunley, was doing, *i.e.*, asking

Automation to hold invoices. There is no room for doubt that Rand directed Automation to hold some quantity of invoices hoping to improve its EBITDA factor and gain up to six times the amount of the held invoices. This action, and the attempt to work the held invoices into the stream of billing in an unidentifiable manner, undoubtedly caused much of the delay for which the trial court erroneously penalized Automation.

In summary, we hold that the present case is much different on the facts from that of **Nashville Ford Tractor**. We have elaborated above on the obvious distinctions. The trial court offered numerous categories of justifications for placing this case within the realm of **Nashville Ford Tractor;** but there is certainly no finding of fraud by clear and convincing evidence. As to the justifications offered by the trial court, we have disagreed with some, and otherwise have not agreed that the somewhat casual justifications support a finding of fraud by the requisite proof. Accordingly, we hold that the trial court abused its discretion in completely denying Automation recovery under **Nashville Ford Tractor**.

We do not reach the issue of whether the trial court erred in granting the motion to alter or amend in the absence of newly discovered evidence or a change in the law. We reiterate that it is permissible under a motion to alter or amend for a trial court to "revisit and rectify errors." **Morrison**, 2002 WL 31423848 at *2.

E.

The next issue we will address is whether the evidence preponderates against the trial court's finding that Rand only owed Automation $2.2 million plus. This discussion will encompass several of the issues we have enumerated above because our reasoning applies equally to all. Our starting place is with the general law of damages. When damages are certain, it is permissible to award damages though there be some uncertainty as to the amount. **BancorpSouth Bank, Inc. v. Hatchel**, 223 S.W.3d 223, 230 (Tenn. Ct. App. 2006). That general rule has considerable sway in the present case. We agree with the trial court that there is little doubt that Automation performed work for which is was not paid. We also agree that the proof as to exactly what remains unpaid leaves much to be desired. One factor that we have already mentioned that weighs in favor of allowing Automation a recovery despite some uncertainty is Rand's role in creating this confusing mess. "[T]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." **Hamilton v. Stardust Theatre, Inc.**, No. M2001-00678-COA-R3-CV, 2002 WL 1284280 at *5 (Tenn. Ct. App. M.S., filed June 11, 2002)*(quoting **Broan Manuf. v. Associated Dist., Inc**., 923 F.2d 1232, 1236 (6th Cir. 1991)).

With these considerations in mind, we recognize Automation's argument that the trial court erred in deducting the $1.5 million credit from its accounts receivable figure and in not adding held invoices of approximately $550,000 to the accounts receivable figure. We also recognize other arguments of similar effect, *i.e.*, that the trial court failed to accept some charges that it should have accepted and gave credits where it should not have given them. We, however, cannot agree that the evidence preponderates against the trial court's finding. Even though we have disagreed that the problems with Automation's proof can be equated to clear and convincing proof of fraud, we do agree that there were many problems with Automation's proof. We, again, commend the trial court for finding a thread of truth in this situation and following it to a logical end. From whatever direction it is followed, that thread always leads to the belief that Automation held approximately $2 million in invoices at Rand's request and later worked those charges into another billing. Also, whether it is payables, or receivables, or tax returns that one believes, it appears fairly clear that everyone in the know thought that Rand owed Automation approximately $3.8 million at the time of the split, after giving Rand credit for payments of approximately $550,000 in 2004 and $833,000 in January 2005. It was after this date that Automation issued a credit in the approximate amount of $1.5 million. We believe the trial court chose a logical route through a confusing situation. We hold that the evidence does not preponderate against the finding that Rand owes Automation $2,270,759.22.

Although neither party has asked us to deal with the trial court's award of prejudgment interest on Automation's counterclaim, we will address it briefly. The court calculated interest from the date the claim was made. Its award is based on a rate of 5% on $550,000 and a rate of 1.25% on the remainder. The award is certainly within the reasonable bounds of discretion. Consistent with our handling of Automation's claim, we reinstate this award of prejudgment interest.

F.

In light of our holding, it should be obvious that we disagree with Automation's argument that the trial court erred in not allowing its full claim for $6,109,075.58 as calculated in its "job cost to date" spreadsheet. Automation criticizes the trial court for its failure to discuss its spreadsheet and underlying data. What the trial court held that we believe did address the substance of Automation's position was that whether it looked at the invoices or the spreadsheet, it believed that Automation included more charges in its claim than it possibly could have been owed. The evidence does not preponderate against that finding. The figures in Automation's spreadsheet are no better than the data input and/or the functional integrity of the computer operation performed on the data. The record in this case demonstrates that whether through inadvertence or intent, data was entered that generated charges that should not have been made. Also, the record demonstrates that the computer is

subject to some human intervention.  Further, the record demonstrates that the human closest to the data and the computer is Tyman Junior whom the trial court found to be less than 100% credible.  It seems to us that the only way the trial court or this Court should consider awarding the exact figure recited on Automation's spreadsheet is if we found its field recording, its date entry, its computer security measures, and its presenting witness to be completely, 100% reliable.  That is not the case.

Rand makes the countervailing argument, stated several times in several ways as has become the practice in this litigation, that we should affirm the trial court's dismissal of Automation's counterclaim on the basis that the invoices are just too unreliable to support a judgment.  Rand argues that the mere recording of the unreliable invoices in financial statements proves nothing.  The death blow, Rand argues, is Automation's abandonment of the invoices as the basis of recovery.  While the argument makes for interesting conversation, it is not a basis for denying Automation all relief.

Rand's argument, when examined beyond the exterior layer, is founded upon several sets of fallacies.  It assumes that the trial court made several findings that it did not make.  For example, Rand argues that the invoices must be inflated beyond any point of reliability because they use a labor multiplier greater than the 3.0 that Nunley approved.  However, the trial court explicitly found that Automation was not bound to a 3.0 multiplier.

The greatest fallacy underlying Rand's argument is that it completely ignores the trial court's finding that even after "limiting" Automation's recovery because of specific concerns, including reliability of the documentation, Rand owed Automation over $2 million for services rendered.  Despite its finding of fraud on Rand's motion to alter or amend, the trial court never changed its finding that Automation did work for which it had not been paid.  At one point Rand argues that the data in the job cost system supports "little more than half" the amount in one set (number 6) of invoices.  Implicit in this fact is that there is hard evidence to show that Automation had done work for which it has not been paid to the tune of approximately one-half of the sixth set of invoices.  If this pattern holds true for all the invoices and underlying documentation, Automation could expect to recover one-half of its claim.  Rand is therefore not harmed by a judgment allowing Automation to recover for one-third of its claim.  Accordingly, we reaffirm our holding that the evidence does not preponderate against the trial court's finding on the amount owed Automation by Rand.

G.

Before leaving the issues pertaining to damages completely, we must deal with arguments Automation makes concerning matters that it contends affected its ability to prove damages. The first of these is Automation's contention  that the trial court erred in denying

it discovery of Rand's job cost system which Automation argues would have proved its damages. Specifically, Automation argues that Rand's job cost data would have shown "that Automation's charges to . . . Rand were in line with . . . Rand's expectations." Automation wants a new trial armed with this material. Rand argues that Automation is simply playing a "tit-for-tat" game that makes no sense in this particular context. Rand pointed out at the hearing on the motion to compel that the other vendors were doing "mechanical" as opposed to electrical work and programming so that any comparison would have been like comparing apples to oranges. Rand also points out that since Automation has been its competitor since the Split, there were good reasons for limiting its discovery of what third parties were charging Rand and what Rand was charging its ultimate customer.

Even if we assume that everything Automation argues is true, it does not prove an abuse of discretion by the trial court. Under the abuse of discretion standard, we do not second-guess the trial court or substitute our discretion for that of the trial court. *Boyd. v. Comdata Network, Inc.*, 88 S.W.3d 203, 211 (Tenn. Ct. App. 2002). It was Automation's burden to prove that the labor, materials, and expenses for which it sought recovery were in fact incurred on Automation projects. Other central issues were whether Automation billed twice for the same work and whether Rand had in fact paid for work without being given credit for the payment. The mere fact that charges on some project, or maybe several collective projects, were hypothetically "in line" with what other mechanical vendors charged Rand or what Rand charged its customers would have little if any bearing on the real issues in the case. *See Johnson v. Nissan North Amer., Inc.*, 146 S.W.3d 600, 610 (Tenn. Ct. App. 2004)(employee plaintiff failed to demonstrate value of information in personnel records of other employees). Therefore, we cannot say that the trial court abused its discretion in denying the discovery. Further, even if we were convinced that the trial court acted outside of the bounds of discretion, Automation has not convinced us that the lack of discovery of Rand's job cost data "more probably than not affected the judgment." Tenn. R. App. P. 36 (b).

H.

Automation also argues it was placed at an unfair disadvantage by being forced to deal with the voluminous 7 day documents introduced by Rand. The 7 day documents include a CD with 2700 pages of documentation and multiple spreadsheets which purportedly show overcharges by Automation. Automation moved in limine to exclude the exhibits on two grounds, *i.e.*, (1) that the trial court had ordered Rand to produce any documents it would use to show overcharges at least 75 days before trial, and (2) that Automation took the deposition of Rand's representative on the subject within that 75 day window and was told that Rand had not quantified the overcharges. We cannot find in Rand's 200 plus page "brief" an argument directed at this issue, but in the hearing held on the morning of trial before the

proof started, Rand argued that there was no new information, and no new substantive documents, in the exhibits. Rand argued that it simply took Automation's documents and processed them into spreadsheets.

Automation concedes that the trial court offered a continuance and offered to allow it to take discovery during the course of the trial. Under these circumstances, we can find no abuse of discretion in the trial court's refusal to exclude the exhibits. *See Bluff Springs Apartments v. Peoples Bank of the South*, No. E2009-01435-COA-R3-CV, 2010 WL 2106210 at *14 (Tenn. Ct. App. E.S., filed May 26, 2010). It is not like the complained-of documents were the only voluminous exhibit. Automation's claim, as it explains in its brief, is made up of 34,000 entries in its job cost system. The record fills 18 boxes. The trial lasted from February 26, 2008, to May 1, 2008, with numerous open dates. Even if a continuance was so distasteful to Automation that it could not be tolerated, Automation had the option of obtaining further discovery concerning the new exhibits during some of the open dates. We hold therefore that the trial court did not abuse its discretion in not excluding the 7 day documents.

I.

The final issue we will address that has an arguable potential to impact the amount of the award on Automation's counterclaim is whether the trial court erred in striking part of Tyman Senior's testimony. The trial court struck Tyman Senior's testimony "with regard to the [labor] multiplier" and "with regard to his testimony on . . . trial exhibit 500." Automation has not given any reasons in its brief why the trial court was in error as to the multiplier, therefore, we will consider any issue as to that part of the trial court's ruling to be waived. *Branum v. Akins*, 978 S.W.2d 554, 557 n.2 (Tenn. Ct. App. 1998). Exhibit 500 was introduced by Rand to show that Automation was overbilling. It portrays Rand's spin on the eight sets of invoices sent to Rand after November 2004, *i.e.*, that duplicative and inflated invoices are contained in the billing. Automation, however, concedes that the billing contains inflated invoices and invoices that duplicate other invoices. Automation's explanation is that Rand was the cause of problem because of its demand that Automation hold invoices and work the charges into the stream. Tyman Senior testified about the events, but the trial court later struck his testimony on the limited subjects because of the court's perception that he lacked personal knowledge and because the court found a violation of the rule of sequestration.

For what it is worth, we agree with Automation that the testimony "with regard to . . . trial exhibit 500" should not have been stricken. Having reviewed the record carefully, we are convinced that Tyman Senior, as the president and manager of Automation at the time in question, was the person on the front line who had personal knowledge of what was going

on with the invoices. The fact that his memory may have needed some prompting does not mean that he had no personal knowledge.

As to Tyman Junior's input into Tyman Senior's testimony about exhibit 500, we also agree with Automation that it was not a violation of the rule of sequestration. The purpose behind the rule of sequestration is "to prevent one witness from hearing the testimony of another and adjusting his testimony accordingly." **State v. Harris**, 839 S.W.2d 54, 68 (Tenn. 1992). This is accomplished by the following directive in Tenn. R. Evid. 615: "The court shall order all persons not to disclose by any means to excluded witnesses any live trial testimony or exhibits created in the courtroom by a witness." The rule of sequestration "does not affect the practice of preparing witness by discussing their own testimony with counsel or others, as long as the actual in-court testimony of other witnesses or the content of exhibits created in the courtroom is not discussed." N. Cohen, S. Sheppeard and D. Paine, Tennessee Law of Evidence § 6.15[9] (9th Ed. 2005). Exhibit 500 was not created in the courtroom and Tyman Junior did not testify concerning exhibit 500. In fact, Tyman Junior was prevented from testifying about exhibit 500 by Rand's objection. Tyman Senior testified that Tyman Junior's involvement in his, Senior's, preparation was to find and furnish data that Senior requested.

However, we do not believe the exclusion, after the fact, of Tyman Senior's testimony prejudiced Automation to the point of affecting the outcome. Automation was able to put the same story of the held invoices before the court through the admissions of Nunley and the testimony of Noll among others. Also, we perceive the trial court's ruling "with regard to . . . trial exhibit 500" to be something less than a total exclusion of Tyman Senior's testimony of the subject of held invoices and substitute invoices. Accordingly, we have considered Tyman Senior's testimony on the subject of the held invoices and on Rand's input into how those charges were to be worked into the stream of billing. We are convinced that the evidence does not preponderate against the trial court's determination of the amount due Automation on its counterclaim. Therefore, we hold that the error of the trial court "with regard to . . . trial exhibit 500" was harmless. Tenn. R. App. 36(b).

J.

Automation also argues that the trial court erred in its credibility determinations with regard to Noll, Tyman Junior, and Roach. As we have previously held, the trial court was in error in disregarding the proven fact of $1.3 million in held invoices. Obviously, in some of our holdings above, we have treated Noll and Tyman Senior, in light of the documentary evidence, as believable and Nunley as unbelievable. Therefore, in our analysis, we have not adopted and applied the trial court's determinations across the board. We have also noted, and reiterate now, that the trial court merely expressed concerns without finding that a given

witness was completely unbelievable on all subjects. Accordingly, we reject Automation's invitation to dissect the testimony of the witnesses point by point and line by line in this voluminous record. We have, and will throughout this opinion, in accordance with established precedent, give deference to the trial court's evaluation of the testimony except where we have found clear and convincing evidence to the contrary. *Wells*, 9 S.W.3d at 783. In those instances, we have tried to make our findings and disagreements known. Accordingly, we decline Automation's invitation to reverse the judgment based on a wholesale reinterpretation of the evidence and reiterate our holding that the evidence does not preponderate against the trial court's finding with regard to the amount Rand owes Automation for work it performed on Rand projects. We will, of course, factor any credibility issues into our discussion of the other claims at issue.

### K.

Automation argues that the judgment against it for reimbursement of rent and taxes paid by Rand on the premises at 106 Spring Road must be reversed. One argument is simply that Automation should not be liable because it did not agree to whatever agreement Rand had with the landlord. We agree with the trial court that if Automation had not liked the arrangement, it should not have moved into the building without negotiating its own arrangement with the landlord. Automation cites no law in support of its position and all the law of which we are aware weighs against Automation. The mere occupation of property implies an agreement to pay a reasonable rent. *Greenwood v. Maxey*, 231 S.W.2d 315, 319 (Tenn. 1950).

Also, Automation argues that Rand received a benefit out of property by using the building for overflow. This may be true, but it is undisputed that Automation was the primary tenant. Automation's argument might have been a basis for apportioning part of the rent to Rand as a subtenant, but Automation is not arguing for that result. Automation simply wants us to ignore its tenancy. We will not. We therefore hold that the trial court did not err in holding Automation responsible to reimburse Rand for the rent and taxes paid on the building at 106 Spring Road.

We have not been shown any reason to disturb the award of prejudgment interest on the award to Rand related to rent and taxes. Therefore the award of prejudgment interest in the amount of $21,899.53 is also affirmed.

### L.

Our holding that Automation is responsible to reimburse Rand for the rent and taxes renders the alternative judgment against Roach moot. The trial court specifically made its

judgment "in the alternative, if the judgment . . . is not upheld against [Automation]." Even if the judgment against Roach were not rendered moot, we do agree with Automation, and Roach, that, after the dismissal of Roach "with prejudice," the trial court erred in sua sponte entering a judgment against Roach. The trial court's justification was that the issue was tried by consent. It is hard to understand how Roach could have consented to the pursuit of the claim against him when the evidence being presented concerning the rent payments he made was relevant to the claim against Automation. *See George v. Building Materials Corp.*, 44 S.W.3d 481, 486 (Tenn. 2001). We note that Rand does not even offer an argument in favor of upholding the judgment against Roach.

M.

The next issue we must address is whether the trial court erred in awarding Rand $500,000 for the Dieco assets. Automation argues that the proof shows the Dieco assets were an outright gift. Rand argues that Automation should have known that it expected to be paid and that Automation was unjustly enriched by the assets, for which it must pay. We think the preponderance of the evidence shows something in between, namely, that the only compensation Rand expected out of the Dieco assets was for Automation to take them and complete the Brown project so that Rand could in turn complete the project and recoup its investment with profit.

The law concerning a gift is simple. A gift of property is "established by delivery with an intention to give" the property to the other. *Roberts v. Baylor School*, No. E2007-00266-COA-R3-CV, 2008 WL 204114 at *5 (Tenn. Ct. App. E.S., filed January 25, 2008). A gift can be subject to a condition subsequent, in which case the gift is forfeited if the condition is not met. *Id.* Unjust enrichment is a different animal with different elements. It is a way of implying a contractual understanding between the parties, in the absence of an express agreement. The main components of unjust enrichment are circumstances showing the parties to the transaction should reasonably have understood that the person providing the benefit expected to be paid, and that it would be unjust for the person receiving the benefit to retain it without payment. *Doe v. HCA Health Services*, 46 S.W.3d 191, 198 (Tenn. 2001); *Paschall's, Inc. v. Dozier*, 407 S.W.2d 150, 155 (Tenn. 1966).

There is no dispute that the reason Rand made a loan to Dieco in the first place, which loan was secured by the assets in question, was to enable Dieco to complete its work on the Brown project so that Rand could in turn show that the tooling it was installing for Brown was operational. There is also no dispute that Automation stepped in, after Dieco defaulted, and completed Dieco's part of the project, the result of which was to allow Rand to salvage its project with a profit. Undoubtedly, Dieco's failure left Rand, in the words of a popular song, "in a bind, and willing to make a deal." *The Devil Went Down to Georgia*, Charlie

-32-

Daniels, et al. Common experience tells us that Rand was not in a position to drive a hard bargain. The favorable outcome to both parties was by no means a given. The circumstances in the present case show that both parties to the transaction reaped a benefit from Automation taking and using the Dieco assets. Even though the assets proved to be valuable to Automation in opening up a line of business, the circumstances indicate that their chief value to Rand, from the time of the loan to Dieco to the time of Dieco's default and shipment to Automation, was as a tool in the hands of an ally to allow completion of the Brown project. Thus, there is nothing unjust in allowing Automation to retain the Dieco assets as a reward for its role in helping Rand complete the Brown project. It is true that Automation was paid by Brown, but Automation introduced proof that, disregarding the assets, it sustained a net loss on the Brown job.

Noll's testimony on direct examination that Rand, through Nunley, made Automation a "gift" of the Dieco assets, and Noll's admission on cross-examination that Nunley did not use the words "gift" or words to that effect are consistent with our interpretation of what was happening. We agree with Automation that is logical to believe that Nunley, who was the man calling the shots at Rand with intentions at the time of selling Rand, would have rather ownership of the Dieco assets go to Automation as part of an ongoing business, in which Nunley held an interest, than become a pile of surplus in a corner of a business that was being sold.

Also, we think it unlikely that Rand would have waited until after the Split to send a bill to Automation for the assets if it had intended from the outset to be paid something above and beyond Automation's completion of the Brown project. We believe the evidence preponderates in favor of finding that the idea of billing Automation for the Dieco assets was a product of the Split – an afterthought that Automation's invoices could be strategically reduced by the worth of the Dieco assets. The "termination" letter, the invoice for the Dieco assets and this litigation were all contemporaneous events. It is also noteworthy that the only part of the Dieco transfer that was documented was the "Lear" account receivable, which was expressly assigned to Automation for a specific business reason. Therefore, we hold that the evidence preponderates against the trial court's finding that Automation owed Rand money for the Dieco assets.

Because we have found no unjust enrichment with regard to the Dieco assets, it is not necessary that we make an exact determination as to their worth, however we think it advisable that we make it clear that the evidence preponderates strongly against Rand's claim that the assets were worth anything like $1.9 million dollars. This is important because the value of the benefit conferred might, in some instances, affect the equities of the situation. The $1.9 million valuation also shows that Automation was not the only party in this case that presented an inflated claim. In our opinion, Rand proved that it met or exceeded

Automation's ability to inflate a claim in litigation by first sending a bill for $500,000, then preparing an exhibit reflecting a value of $1.4 million, and then amending that exhibit during trial to reflect a value of $1.9 million. In short, the evidence does not preponderate against the trial court's valuation of the Dieco assets.

Before leaving this issue, we will also comment on the trial court's observation concerning a perceived credibility issue with Mr. Noll with regard to the Dieco assets. We think this is important since we have obviously given some credence to Noll's account of a conversation with Nunley about the Dieco assets. It is important to note that there is no doubt some discussion preceded the shipment of the Dieco assets to Automation. The question is whether Noll's account of those discussions is to be believed over Nunley's.

The trial court's comments concerning Noll's credibility were not made in its analysis of the Dieco assets. Rather, they were made in support of the trial court's general balancing of testimony on the billing issues. The trial court's misgivings with Noll's credibility concerned his role in preparing an exhibit during trial which purported to dispute a Rand exhibit as to the Dieco assets that Automation received. The court's basis for criticizing Noll was that Automation employees signed shipping receipts for Dieco assets. Presumably, the signed receipts conflicted with Noll's account. The shipping documents by no means provided an exhaustive list of what was received versus what was missing. Our understanding of the exhibit to which the trial court referred is not that Noll disputed receiving several shipments of Dieco assets. Rather, Automation and Noll were trying to show that the real value was less than what Rand sought because not all the assets that Rand took through foreclosure in Canada made it to Automation's plant. It is an undisputed fact in this case that two cranes were left in Canada and other assets were in such bad condition that they were not even loaded for shipment. Further, Noll admitted that his account of the Dieco assets was based on a recent walk through the plant and not on the date of shipment or receipt.

Since there is not an express finding that Noll's testimony was not believable on the subject of how the Dieco assets came to be committed to Rand, we are unable to defer to the trial court's general comments. We have made our own determination based on the preponderance of the evidence. ***Kesterson,*** 172 S.W.3d at 566.

Given that we have overturned the monetary award, there is no basis for an additional award of prejudgment interest. Accordingly the award of $45,000 in prejudgment interest is reversed.

N.

The final issue Automation raises is whether the trial court erred in awarding Rand discretionary costs that are not recoverable. Discretionary costs are controlled by Tenn. R. Civ. P. 54.04(2), which, incidentally, Automation does not cite. Since Automation has raised the issue of discretionary costs, we must look to the Rule for guidance. Discretionary costs are only recoverable to the "prevailing party." Our holdings in this case have resulted in a "new prevailing party" under the guidance of Rule 54.04(2). Accordingly we reverse the award of discretionary costs in favor of Rand. Automation, as the new prevailing party, "may request discretionary costs by filing a motion in the trial court" on remand. ***Id.***

V.

The judgment of the trial court is reversed in part and affirmed in part. The order granting Rand's motion to alter or amend the earlier judgment on the basis of fraud is reversed. That part of the original judgment of the trial court awarding Automation judgment against Rand in the amount of $2,270,759.22 plus prejudgment interest in the amount of $256,705.19 is reinstated and, as such, is affirmed. That part of the original judgment awarding Rand a judgment against Automation for reimbursement of rent and taxes plus prejudgment interest is affirmed. That part of the original judgment awarding Rand a judgment for the value of the Dieco assets is reversed, as is the award of prejudgment interest on that claim. The award of discretionary costs in favor of Rand is reversed. Costs on appeal and at trial are taxed to the appellee, Tennessee Rand, Inc. This case is remanded, pursuant to applicable law, for collection of the costs at trial as modified by us and for such further proceedings, if any, as may be required, consistent with this opinion.

_____
CHARLES D. SUSANO, JR., JUDGE